

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00230-CV

_____

JOHN STEPHEN VANDERBOL III, Appellant

V.

JENSEN ELAINE PAIGE VANDERBOL, Appellee

On Appeal from the 235th District Court
Cooke County, Texas
Trial Court No. CV16-00095

Before Birdwell, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Appellant John Stephen Vanderbol III (Husband) appeals from a divorce decree dissolving his marriage to appellee Jensen Elaine Paige Vanderbol (Wife). In five issues, Husband argues that the trial court abused its discretion by (1) ordering him to pay $1,840 per month in child support and $100 per month in cash medical support despite a lack of evidence to justify these awards; (2) ordering the division of property not proven to belong to the marital estate; (3) granting Husband limited supervised visitation rights to his and Wife's child (Child), and conditioning Husband's visitation rights on his completion of a psychological evaluation; (4) ordering Husband to post a bond if he appealed the divorce decree; and (5) requiring Husband to produce documents relating to a trust that he purportedly established to provide for Child in the event of a divorce. Because we partially sustain Husband's first issue, we reform and affirm the trial court's child-support award and the amount of the bond securing this obligation conditioned on Wife's timely filing the remittitur suggested herein. Sustaining Husband's fourth issue, we modify the divorce decree to delete the appellate bond requirement. Overruling the remainder of Husband's issues, we affirm the decree in all other respects.

## I. BACKGROUND

Husband and Wife married in 2011 and separated in February 2015. Because the parties were unable to reconcile after separating, Wife sued for divorce in February 2016, and Husband eventually countersued. The protracted divorce

proceedings focused on the division of the couple's property and the allocation of Husband's and Wife's parental rights and obligations with respect to their only child.

After a two-day bench trial, the trial court signed a final divorce decree in April 2023. Among other things, the decree (1) appointed Husband and Wife as Child's joint managing conservators but granted Wife certain exclusive rights, including the right to designate Child's primary residence; (2) ordered Husband to pay Wife $1,840 in monthly child support and $100 in cash medical support and to deposit $50,000 into the trial court's registry to secure the payment of his child-support obligations; (3) granted Husband limited supervised visitation rights with respect to Child and conditioned these visitation rights on his completion of, among other things, a psychological evaluation; (4) ordered Husband to post a bond if he appealed the divorce decree; and (5) directed Husband to produce documents relating to the Schwarzer Angriffishund Trust (the Child-Support Trust), which Husband had purportedly established to provide support for Child if Wife and Husband divorced. This appeal ensued.

## II. DISCUSSION

### A. Child Support and Cash Medical Support

In his first issue, Husband argues that the trial court abused its discretion by ordering Husband to pay Wife $1,840 per month in child support and $100 per month in cash medical support and to deposit $50,000 into the court's registry to secure the payment of his child-support obligation. Specifically, Husband contends

that the evidence was insufficient to support the trial court's finding that Husband had net resources of $9,200 per month and that the trial court abused its discretion by using this unsupported finding to calculate the amount of Husband's support obligations. Because we agree that the evidence was insufficient to support the trial court's monthly-net-resources finding, we sustain Husband's first issue as it pertains to the child-support award and the $50,000 bond requirement, but we affirm the trial court's cash-medical-support award.

## 1. Standard of Review

We review a trial court's judgment granting child support for an abuse of discretion. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *B.K. v. T.K.*, No. 02-19-00472-CV, 2021 WL 2149621, at *2 (Tex. App.—Fort Worth May 27, 2021, no pet.) (mem. op.). A trial court abuses its discretion when it acts arbitrarily or without reference to guiding principles or when it fails to analyze or apply the law correctly. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding); *B.K.*, 2021 WL 2149621, at *2. Although sufficiency of the evidence is not an independent ground of error under the abuse-of-discretion standard, it is a factor in assessing whether the trial court abused its discretion. *In re A.L.S.*, 338 S.W.3d 59, 65 (Tex. App.—Houston [14th Dist.] 2011, pet. denied); *London v. London*, 94 S.W.3d 139, 143–44 (Tex. App.—Houston [14th Dist.] 2002, no pet.). When, as here, the trial court did

4

not issue findings of fact or conclusions of law,[1] we presume that the trial court made all findings necessary to support the judgment and will uphold those findings if they are supported by the record. *A.L.S.*, 338 S.W.3d at 65 (citing *Chenault v. Banks*, 296 S.W.3d 186, 189 (Tex. App.—Houston [14th Dist.] 2009, no pet.)); *see Barber v. Barber*, No. 02-21-00291-CV, 2022 WL 4105363, at *3 (Tex. App.—Fort Worth Sept. 8, 2022, no pet.) (mem. op.) (citing *Worford*, 801 S.W.2d at 109).

### 2. Statutory Child-Support Guidelines

When calculating the amount of cash medical support, ongoing child support, or retroactive child support presumed to be reasonable under Texas law, the obligor's gross and net resources are key variables. *See* Tex. Fam. Code Ann. §§ 154.062, .125, .131.

If neither parent has access to private health insurance and the children receive medical care through a government program—as Wife testified Child does here—the trial court must order cash medical support in "an amount[] not to exceed nine percent of the obligor's annual resources." *Id.* § 154.182(b)(3), (b-2).

---

[1]Although Husband requested findings of fact and conclusions of law, his request was filed after the applicable deadline. *See* Tex. R. Civ. P. 296. The trial court never filed findings of fact or conclusions of law in accordance with Husband's late-filed request, and Husband never filed a notice of past-due findings of fact and conclusions of law. *See* Tex. R. Civ. P. 297. Further, because Husband's written request was filed after the divorce decree was signed and the amount of child support ordered by the court was consistent with the applicable percentage guidelines, the trial court was not required to make findings under Family Code Section 154.130. *See* Tex. Fam. Code Ann. § 154.130(a).

The amount of cash medical support is then deducted from the obligor's gross resources (along with taxes and certain other expenses) to calculate the obligor's net resources. *See id.* § 154.062(d). And the amount of the obligor's net resources is used to determine his presumptively reasonable child-support payments. *See id.* §§ 154.122, .125.

By statute, "child support is generally determined by calculating the child[-]support obligor's monthly net resources and applying statutory guidelines to that amount." *Gonzalez v. Gonzalez*, 331 S.W.3d 864, 868 (Tex. App.—Dallas 2011, no pet.). The statutory guidelines provide, for example, that an obligor with one child will pay either fifteen percent or twenty percent of his net resources, depending on whether those net resources are above a certain threshold. Tex. Fam. Code Ann. § 154.125(b), (c); *see Stringfellow v. Stringfellow*, 538 S.W.3d 116, 118 (Tex. App.—El Paso 2017, no pet.). However, "when a child-support obligor's monthly net resources exceed a 'maximum amount of net resources to which the statutory guidelines are applicable,' which is currently set at $9,200, a trial court 'shall presumptively apply the percentage guidelines to the portion of the obligor's net resources that does not exceed that amount.'" *In re Howley*, No. 03-21-00318-CV, 2021 WL 5750190, at *3 (Tex. App.—Austin Dec. 3, 2021, orig. proceeding) (mem. op.) (quoting Tex. Fam. Code Ann. § 154.126(a)). Thus, $9,200 is the current maximum amount of monthly net resources to which the statutory guidelines may be applied. *See* Tex. Fam. Code Ann. § 154.126(a); *In re B.R.M.*, No. 09-21-00397-CV, 2023 WL 2530260, at *3 (Tex. App.—Beaumont Mar. 16, 2023, no pet.) (mem. op.).

6

Absent evidence of the obligor's gross resources, the trial court "shall presume that the party has income equal to the federal minimum wage for a 40-hour week," Tex. Fam. Code Ann. § 154.068(a), which equates to approximately $15,080 per year or $1,256.67 per month, 29 U.S.C.A. § 206(a)(1)(C); *M.G. v. T.G.*, No. 02-21-00433-CV, 2023 WL 2178762, at *4 (Tex. App.—Fort Worth Feb. 23, 2023, no pet.) (mem. op.) (calculating gross resources and explaining); *Cervenka v. Cervenka*, 672 S.W.3d 814, 819–20 & n.1 (Tex. App.—Corpus Christi–Edinburg 2023, no pet.) (similar); *Gonzalez*, 331 S.W.3d at 868 & n.2 (similar).

### 3. Insufficient Evidence of Husband's Monthly Net Resources

Here, the trial court found that Husband's monthly net resources were $9,200 and then used this figure to calculate Husband's monthly child-support obligation in accordance with the statutory guidelines. *See* Tex. Fam. Code Ann. § 154.125(b). But the record lacks sufficient evidence to support the monthly-net-resources finding.

Husband, who has suffered at least two strokes and has been diagnosed with cancer, testified that he is currently unemployed and has been receiving medical treatment in Thailand because he cannot afford the costs of medical care in the United States. He explained that the costs of his various medical treatments and his living expenses are paid for by a trust (the Irrevocable Trust).

Wife claimed that although Husband was unemployed, he received income from various trusts, including the Irrevocable Trust and a separate trust that his

parents established for their own benefit (the Parents' Trust).[2] But, as explained below, the evidence that Wife offered in this regard was not sufficiently specific or detailed to support the trial court's monthly-net-resources finding.

Wife testified that she knew that Husband "had a lot of assets in a trust," but she offered no evidence regarding the value of these assets or the amounts of any specific distributions that Husband had received. Wife also testified that during their marriage, Husband and Wife had "use[d] money" from the Parents' Trust. According to Wife, Husband could simply request money from his father, who would then write him a check from the Parents' Trust. To Wife's knowledge, Husband's father had never refused such a request. However, the record contains no details concerning the amounts or frequency of these payments or whether they were meant to be gifts or loans. Wife also testified that when she and Husband were together, they were able to pay approximately $5,000 per month in credit-card bills. But because Husband and Wife separated approximately eight years before trial, this evidence has little, if any, bearing on Husband's current financial situation, particularly given Husband's significant health problems since the couple separated. *See, e.g.*, *In re Marriage of Seager*,

---

[2]Husband explained that there were three separate trusts referenced in the record: the Irrevocable Trust, the Parents' Trust, and the Child-Support Trust. He testified that he originally formed the Irrevocable Trust in 1995 but that he was "not [a] party to" the Parents' Trust "at all" and "ha[d] no idea" when it was created. He stated that "about six months before" he married Wife, he set up the Child-Support Trust at the direction of the Irrevocable Trust's trustee because the Irrevocable Trust's governing documents prohibit its assets from being used to pay for child support or other similar obligations incident to a divorce proceeding.

07-02-00492-CV, 2003 WL 2004537, at *1 (Tex. App.—Amarillo May 1, 2003, no pet.) (mem. op.) (holding that evidence of obligor's income from temporary orders hearing held twenty months before trial "constitute[d] no evidence of a substantive and probative nature upon which the trial court could order him to pay [child] support" because the record showed that obligor had since had a brain aneurysm that rendered him disabled). Further, although Husband acknowledged that the Irrevocable Trust is currently paying his living expenses and the costs of his medical treatments in Thailand, the record contains no information concerning the specific amounts of these expenses.

Wife also theorized that Husband received significant income from an entity called 9-Ten Holdings, Inc., a Wyoming corporation whose corporate filings purportedly name Husband as a director and his girlfriend as the president, or, at a minimum, that Husband had used 9-Ten Holdings's bank account to hide or shield marital assets. But although Husband admitted that he was a director of 9-Ten Holdings, he denied receiving a salary or anything else from the company besides a monthly gym membership given to him by his girlfriend as a Christmas gift; he is not listed as a signatory on the company's bank accounts; and the company's bank records do not show any salary or other regular payments to Husband.[3]

---

[3]The bank records reflect that 9-Ten Holdings issued a check to Husband for $8,655.25 in July 2020 and another for $300 in October 2020. It is unclear what these payments were for, but the timing and varying amounts of the payments suggest that they were not paychecks.

9

Wife claimed that in 2021, Husband had written checks totaling approximately $66,000 from 9-Ten Holdings's account to pay for charges that he had made on a Navy Federal Credit Union credit card.[4] But while 9-Ten Holdings's bank records reflect payments to Navy Federal Credit Union to service credit-card debt, nothing in the record shows what these credit-card charges were for. Indeed, during trial, 9-Ten Holdings's attorney asserted that these credit-card charges were for the company's routine business expenses. And Husband denied that he had ever used a Navy Federal Credit Union credit card[5] or had written checks on 9-Ten Holdings's account. Thus, Wife's theory that 9-Ten Holdings's credit-card payments to Navy Federal Credit Union were for Husband's personal expenses rests on mere speculation, which is not evidence. *See Hurley v. Tarrant Cnty.*, 232 S.W.3d 781, 787 (Tex. App.—Fort Worth 2007, no pet.) (citing *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 164 (Tex. 2004)); *see also McKinney Ave. Props. No. 2, Ltd. v. Branch Bank & Tr. Co.*, No. 05-14-

---

[4]In her appellate briefing, Wife claims that, in addition to the Navy Federal Credit Union payments, 9-Ten Holdings issued checks for, among other things, Husband's rent, residential utility bills, and attorney's fees. But the record is undeveloped as to these supposed payments, and other than Wife's counsel's cursory remarks during his opening statement, there is nothing to connect any payments reflected in 9-Ten Holdings's bank records to Husband's living expenses or attorney's fees. For example, 9-Ten Holdings's bank records show checks written to Vijay Prathani in 2019, 2020, and 2021, and Wife's counsel asserted in his opening statement that "we have checks to the landlord" and that "[o]ne of his landlords . . . I believe is Mr. Prathani," but Wife's counsel never questioned Husband about these checks or asked him to confirm whether Mr. Prathani was, in fact, his landlord at the time the checks were written.

[5]Wife testified that Husband had used a Navy Federal Credit Union credit card when they lived together.

00206-CV, 2015 WL 3549877, at *9 (Tex. App.—Dallas June 5, 2015, no pet.) (mem. op.) (noting that while a party is entitled to reasonable inferences from the evidence, a party cannot create a fact issue based on mere speculation).

Wife also points to Husband's ability to clear certain past-due child-support obligations by making large lump-sum payments[6] as evidence supporting the trial court's monthly-net-resources finding. But Husband testified that he had borrowed the money to make the most recent of these payments from his father and his girlfriend, and the record contains no evidence regarding the source of the funds used for the other payments.

Finally, Wife notes that in Husband's pro se complaint filed against State Farm in February 2019, he claimed that he had suffered $3.64 million in property damage as a result of a fire and suggests that this supports the trial court's monthly-net-resources finding. But this fire occurred in February 2017. Thus, while Husband may have judicially admitted that he had at least $3.64 million in assets approximately seven years ago, *see TX Far W., Ltd. v. Tex. Invs. Mgmt., Inc.*, 127 S.W.3d 295, 307 (Tex. App.—Austin 2004, no pet.) (quoting *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 568 (Tex. 2001)), this admission does not constitute substantive and probative evidence of his current financial situation, *see Marriage of Seager*, 2003 WL 2004537, at *1. Indeed, as discussed below, the record reflects that Husband settled

---

[6]According to Wife, Husband made lump-sum payments of $18,360.30 in October 2018; $7,802.74 in January 2020; $7,500.00 in March 2021; and $15,000.00 in January 2023.

11

his lawsuit against State Farm—in which Husband also asserted claims for economic damages and fraud and sought the recovery of $175,940,000 in total damages—for approximately $438,343,[7] and the trial court awarded Wife one-half of this amount in its division of the marital estate. Therefore, even if Husband did have $3.64 million worth of personal property that was destroyed in the February 2017 fire, he was able to recoup only a small fraction of its value from State Farm.

Although the record certainly engenders the belief that Husband comes from an affluent background and has considerable financial resources available to him, it contains no substantive or probative evidence of Husband's current income, including trust income, or the assets that he—or any trust with which he is associated—owns.[8]

---

[7]Husband and his girlfriend each filed suit against State Farm to recover on claims related to the fire that damaged their residence. Their lawsuits were later consolidated, and ultimately a settlement was reached resolving all of Husband's and his girlfriend's claims against State Farm. State Farm issued settlement checks payable to both Husband and his girlfriend totaling approximately $876,686. Husband's one-half share of the settlement payments equals $438,343.

[8]It appears from the record that Wife attempted to obtain financial data from Husband and that Husband failed to respond to her discovery requests. Rule 215.3 of the Texas Rules of Civil Procedure provides:

> If the court finds a party is abusing the discovery process in seeking, making or resisting discovery or if the court finds that any interrogatory or request for inspection or production is unreasonably frivolous, oppressive, or harassing, or that a response or answer is unreasonably frivolous or made for purposes of delay, then the court in which the action is pending may, after notice and hearing, impose any appropriate sanction authorized by paragraphs (1), (2), (3), (4), (5), and (8) of Rule 215.2(b). Such order of sanction shall be subject to review on appeal from the final judgment.

*Cf. Panozzo v. Panozzo*, 904 S.W.2d 780, 785 (Tex. App.—Corpus Christi–Edinburg 1995, no writ) ("Apparently, Husband is financially well off and has considerable resources available to him, but that belief is no substitute for evidence."). There is nothing in the record to substantiate the trial court's finding that Husband has monthly net resources of $9,200. Because the record contains insufficient evidence to support the trial court's monthly-net-resources finding, the trial court abused its discretion by ordering Husband to pay $1,840 per month in child support. *See M.G.*, 2023 WL 2178762, at *3–4 (concluding that evidence was insufficient to support child-support award because husband had failed to "provide evidence of [wife's] past or present resources" and had "merely estimated her earning ability via work and possibly her trust fund"); *Panozzo*, 904 S.W.2d at 785 (holding that the trial court had abused its discretion by ordering husband to pay $10,000 per month in child support for two children even though "[t]here were references in the . . . record to substantial

---

Tex. R. Civ. P. 215.3. Thus, if this case is remanded because Wife does not agree to the remittitur suggested below and the trial court finds after notice and a hearing that Husband is abusing the discovery process, it has the discretion—subject to review for abuse—to sanction Husband by, *inter alia*, ordering "that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with" Wife's claim or "refusing to allow [Husband] to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence." Tex. R. Civ. P. 215.2(b)(3)–(4), 215.3; *see In re J.D.N.*, 183 S.W.3d 128, 131–32 (Tex. App.—Dallas 2006, no pet.) (holding that trial court did not abuse its discretion by imposing death-penalty sanctions on father, deeming his monthly income to be $6,000, and then awarding $1,200 in monthly child support based on statutory guidelines after the father had repeatedly been warned yet failed to provide financial documentation of his net resources).

monies on deposit in Brownsville" because "there was no evidence offered of [h]usband's income or net resources as defined by the [Family] Code").

Accordingly, we sustain Husband's first issue as it pertains to the trial court's child-support award.

### 4. Cash Medical Support

The lack of evidence to support the trial court's monthly-net-resources finding necessitates the reformation or reversal of the child-support award, but the same does not hold true for the cash-medical-support award. As noted above, because Child receives medical care through a government program, the trial court was required to order cash medical support in "an amount[] not to exceed nine percent of [Husband's] annual resources." Tex. Fam. Code Ann. § 154.182(b)(3), (b-2). Further, absent evidence of an obligor's gross resources, the Family Code provides that the trial court "shall presume that the party has income equal to the federal minimum wage for a 40-hour week," *id.* § 154.068(a), that is, $1,256.67 per month, 29 U.S.C.A. § 206(a)(1)(C); *M.G.*, 2023 WL 2178762, at *4. Because the trial court's cash-medical-support award of $100 per month does not exceed nine percent of this presumed income amount,[9] it does not constitute an abuse of discretion. Accordingly, we overrule Husband's first issue as it pertains to the cash-medical-support award.

---

[9]Nine percent of $1,256.67 is $113.10, but the trial court ordered Husband to pay only $100 in cash medical support.

14

### 5. Child-Support Bond

Family Code Section 157.109 authorizes a trial court to order a support obligor to post a bond to secure payment of his support obligations if, among other things, he "is employed by an employer not subject to the jurisdiction of the court or for whom income withholding is unworkable or inappropriate." Tex. Fam. Code Ann. § 157.109(a)(2). Because Husband is a self-described "entrepreneur" who has had offices overseas and spends significant time in Thailand, the trial court acted within its discretion by determining that income withholding is unworkable in this case and ordering Husband to post a bond. *See id.*; *In re Gonzalez*, 993 S.W.2d 147, 157 (Tex. App.—San Antonio 1999, no pet.) (holding that trial court acted within its discretion by ordering obligor to post a bond because the evidence showed that he was "a citizen and resident of Mexico, that he [was] employed by Mexican companies owned by himself and his family, and that his salary d[id] not include all the monetary benefits he receive[d] from the companies"). However, because the bond amount was based upon the trial court's improper child-support award, we sustain Husband's first issue as it pertains to the amount of the bond.

### 6. Remittitur Suggestion

As noted above, without evidence regarding the resources available to Husband, the trial court was required to presume that he worked forty hours per week earning the federal minimum wage. *See* Tex. Fam. Code Ann. § 154.068(a); *M.G.*, 2023 WL 2178762, at *4. This equates to gross resources of $1,256.67 per month.

15

29 U.S.C.A. § 206(a)(1)(C); *M.G.*, 2023 WL 2178762, at *4. Deducting federal income and social security taxes[10] leaves a balance of approximately $1,168.67 per month.[11] Tex. Fam. Code Ann. § 154.062(d)(1)–(2). Subtracting the $100-per-month cash-medical-support award from this balance leaves presumed net resources of $1,068.67 per month. *Id.* § 154.062(d)(5).

Per the statutory guidelines, Husband's child support obligation would be twenty percent of his monthly net resources, or $213.73 per month. *Id.* § 154.125(b). Thus, the trial court's child-support award is excessive by $1,626.27 per month.

We suggest that Wife file a remittitur within fifteen days from the date of this opinion. *See* Tex. R. App. P. 46.3. On the condition that Wife agrees to a reduction in Husband's child-support obligation from $1,840 per month to $213.73 per month and a proportionate reduction of the child-support bond from $50,000 to $5,808, we

---

[10]Because Husband testified that he plans to live in Texas going forward, there is no need to deduct any amounts for state income tax. *See* Tex. Fam. Code Ann. § 154.062(d)(3); *see also In re A.M.*, No. 07-20-00130-CV, 2020 WL 7651973, at *4 (Tex. App.—Amarillo Dec. 23, 2020, pet. denied) (mem. op.) (noting that Texas does not have a state income tax).

[11]The social-security-tax rate is 6.2 percent, which, for a full-time minimum-wage worker, equates to approximately $78 per month. *See* 26 U.S.C.A. § 3101(a). As of the 2023 tax year, the federal income tax rate for single filers is ten percent on the first $11,000 of taxable income. IRS, *Federal Income Tax Rates & Brackets*, https://www.irs.gov/filing/federal-income-tax-rates-and-brackets (last visited Apr. 26, 2024). The standard deduction for single filers is $13,850. IRS, *IRS Provides Tax Inflation Adjustments for Tax Year 2023*, https://www.irs.gov/newsroom/irs-provides-tax-inflation-adjustments-for-tax-year-2023 (last visited Apr. 26, 2024). Thus, a single full-time minimum-wage worker would pay approximately $120 per year, or $10 per month, in federal income tax.

reform and affirm these aspects of the divorce decree. *See id.* However, if no remittitur is filed, having found that the trial court abused its discretion in awarding child support, we will reverse the child-support award and remand this matter to the trial court for a new trial regarding Husband's child-support obligation and the amount of the bond securing that obligation. *See id.*; *Blazek v. Blazek*, 669 S.W.2d 347, 348–49 (Tex. App.—Houston [14th Dist.] 1984, no writ) (suggesting remittitur regarding excessive child-support award and ultimately reversing and remanding trial court's judgment after the suggested remittitur was not filed).

## B. Property Division

In his second issue, Husband argues that the trial court abused its discretion by awarding Wife $219,171.40 as her share of the settlement proceeds that Husband and his girlfriend received from State Farm.[12] Husband contends that the trial court erred by determining that these proceeds were community property. We disagree.

### 1. Applicable Law and Standard of Review

Considering both parties' rights, a trial court is charged with dividing the community estate in a "just and right" manner. Tex. Fam. Code Ann. § 7.001; *Watson v. Watson*, 286 S.W.3d 519, 522 (Tex. App.—Fort Worth 2009, no pet.). We review the trial court's division of property under an abuse-of-discretion standard. *See, e.g., Loaiza*

---

[12]As noted above, Husband and his girlfriend received a total of $876,685.59 in settlement proceeds from State Farm. *See supra* note 7. The trial court awarded Wife one-half of Husband's one-half share of these proceeds, or one-fourth of the total amount.

*v. Loaiza*, 130 S.W.3d 894, 899 (Tex. App.—Fort Worth 2004, no pet.) (citing *Murff v. Murff*, 615 S.W.2d 696, 698–99 (Tex. 1981)).

Only community property is subject to the trial court's just-and-right division in a divorce proceeding. *Barnard v. Barnard*, 133 S.W.3d 782, 789 (Tex. App.—Fort Worth 2004, pet. denied). Generally, all property possessed by either spouse during or on dissolution of the marriage is presumed to be community property. *See* Tex. Fam. Code Ann. § 3.003(a). This is a rebuttable presumption, and a spouse claiming that any asset is separate property must prove the separate character of the property by clear and convincing evidence. *See id.* § 3.003(b). "A party seeking to rebut the community presumption must trace the assets on hand during the marriage back to property that is separate in character." *In re Marriage of Nash*, 644 S.W.3d 683, 696–97 (Tex. App.—Texarkana 2022, no pet.) (quoting *In re Marriage of Born*, No. 06-08-00066-CV, 2009 WL 1010876, at *2 (Tex. App.—Texarkana Apr. 16, 2009, no pet.) (mem. op.)). "Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property." *Id.* at 697 (citing *Boyd v. Boyd*, 131 S.W.3d 605, 612 (Tex. App.—Fort Worth 2004, no pet.)). "[C]onclusory or uncorroborated testimony that funds are separate property is insufficient to rebut the community presumption, unless there is also evidence that traces the funds." *Id.* (quoting *Marriage of Born*, 2009 WL 1010876, at *5); *accord Remley v. Remley*, No. 02-07-00044-CV, 2008 WL 4355347, at *3 (Tex. App.—Fort Worth Sept. 25, 2008, no pet.) (per curiam)

(mem. op.) (citing *Irvin v. Parker*, 139 S.W.3d 703, 708 (Tex. App.—Fort Worth 2004, no pet.)). Any doubt as to the character of the property should be resolved in favor of the community estate. *Irvin*, 139 S.W.3d at 708 (citing *Boyd*, 131 S.W.3d at 612); *Akin v. Akin*, 649 S.W.2d 700, 703 (Tex. App.—Fort Worth 1983, writ ref'd n.r.e.).

The community presumption applies to settlement proceeds. *See Thornhill v. Thornhill*, 666 S.W.3d 823, 827 (Tex. App.—Houston [14th Dist.] 2023, no pet.); *Licata v. Licata*, 11 S.W.3d 269, 273 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). Because of this presumption, if a spouse receives a settlement from a lawsuit during marriage, some or all of which could be community property, it is that spouse's burden to prove by clear and convincing evidence which portion of the settlement does not belong to the community estate. *Thornhill*, 666 S.W.3d at 827 (first citing *Farmers Tex. Cnty. Mut. Ins. Co. v. Okelberry*, 525 S.W.3d 786, 793–94 (Tex. App.—Houston [14th Dist.] 2017, pet. denied); and then citing *Licata*, 11 S.W.3d at 273).

Thus, to establish an abuse of discretion here, Husband must demonstrate that he presented conclusive evidence that the settlement proceeds did not belong to the marital estate. *See Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017) (explaining that when a party attacks the legal sufficiency of an adverse finding on an issue on which it bears the burden of proof, the judgment must be sustained unless the record conclusively establishes all vital facts in support of the issue). "Evidence is conclusive only if reasonable people could not differ in their conclusions . . . ." *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005).

19

## 2. Analysis

Husband argues that the trial court abused its discretion by awarding Wife one half of his share of the settlement proceeds because the record contains no evidence proving that Husband owned the house that burned down or that he received compensation for anything other than his separate personal property lost in the fire. But Husband's argument reverses the burden of proof. Because Husband's lawsuit against State Farm included community claims, it was not Wife's burden to prove that the settlement proceeds belonged to the community estate; rather, it was Husband's burden to prove by clear and convincing evidence that they did not. *See Thornhill*, 666 S.W.3d at 827. And Husband has not shown that he presented conclusive evidence rebutting the community presumption. *See Shields Ltd. P'ship*, 526 S.W.3d at 480.

Husband's lawsuit against State Farm included claims for economic damages based on "lost value, loss of opportunity, and loss of 'business momentum'" and "loss of ability to conduct business." To the extent that the settlement proceeds cover these losses pertaining to Husband's lost earning capacity, they belong to the community estate. *See* Tex. Fam. Code. Ann. § 3.001(3); *Thornhill*, 666 S.W.3d at 827 (explaining that "recovery for loss of earning capacity . . . and other expenses associated with injury to the community estate are community property"). Because some or all of the settlement proceeds could be community property, it was Husband's burden to prove by clear and convincing evidence which portion of the settlement does not belong to the community estate. *See Thornhill*, 666 S.W.3d at 827.

20

Although Husband contends that the settlement proceeds were to cover damage to the house—which he claims was solely owned by his girlfriend—and his separate personal property, the only evidence in the record to support this contention is Husband's own testimony. *See Marriage of Nash*, 644 S.W.3d at 697 (noting that, standing alone, "[c]onclusory or uncorroborated testimony that funds are separate property is insufficient to rebut the community presumption"). The settlement checks from State Farm do not explicitly state what losses they are intended to cover, and they list both Husband and his girlfriend as payees.[13] Thus, the evidence regarding which losses the settlement proceeds were intended to cover is far from conclusive.

Further, even if we were to assume that Husband had successfully shown that the settlement proceeds were for damage to the house and Husband's personal property, the trial court still could have reasonably concluded that Husband failed to present clear and convincing evidence rebutting the community presumption. *See City of Keller*, 168 S.W.3d at 816. The only evidence that the house was solely owned by Husband's girlfriend is Husband's own testimony; he offered no certificate of title,

---

[13]Husband makes much of the fact that his girlfriend was listed as the payee for a majority of the checks on State Farm's pay log and asserts that this means that she was the "lead payee" for these amounts. But all of the actual checks offered into evidence were made payable to both Husband and his girlfriend and specifically stated on the reverse side that they "must be endorsed by all payees." The pay log appears to list whichever payee's name appears first on the check as the "payee." However, Husband has not shown that the order in which State Farm lists the payees on the checks indicates the loss that the check is intended to cover. Nor has he cited any authority showing that the order in which the payees are listed on the check bears any legal significance, nor are we aware of any.

deed records, or other documentary evidence showing that he lacked an ownership interest in the house. Similarly, Husband's own testimony is the only evidence supporting his claim that the personal property damaged in the fire was his separate property. But mere testimony of property's separate character that is unsupported by documentary evidence is generally insufficient to satisfy the clear-and-convincing standard. *In re Marriage of Williams*, No. 14-15-00090-CV, 2016 WL 2997094, at *2 (Tex. App.—Houston [14th Dist.] May 24, 2016, no pet.) (mem. op.) (first citing *Graves v. Tomlinson*, 329 S.W.3d 128, 139 (Tex. App.—Houston [14th Dist.] 2010, pets. denied); and then citing *Zamarripa v. Zamarripa*, No. 14-08-00083-CV, 2009 WL 1875580, at *4 (Tex. App.—Houston [14th Dist.] June 30, 2009, pet. denied) (mem. op.)); *see Marriage of Nash*, 644 S.W.3d at 697; *see also McShane v. McShane*, No. 03-01-00721-CV, 2003 WL 1338722, at *3 (Tex. App.—Austin Mar. 20, 2003, no pet.) (mem. op.) ("Uncorroborated testimony of an interested witness, even if uncontradicted, generally does not establish a fact conclusively . . . ." (citing *Kirtley v. Kirtley*, 417 S.W.2d 847, 853 (Tex. App.—Texarkana 1967, writ dism'd w.o.j.))).

In sum, given this record, the trial court reasonably could have concluded that Husband failed to rebut the presumption that the settlement proceeds were community property. *See Thornhill*, 666 S.W.3d at 827. Thus, Husband has not established that the trial court abused its discretion by awarding Wife a share of the settlement proceeds as part of its division of the community estate. *See Lecuona v. Lecuona*, No. 03-17-00138-CV, 2018 WL 2994587, at *2 (Tex. App.—Austin June 15,

22

2018, pet. denied) (mem. op.); *see also City of Keller*, 168 S.W.3d at 816 (explaining that evidence is not conclusive if reasonable people could differ in their conclusions).

Accordingly, we overrule Husband's second issue.

## C. Husband's Visitation Rights with Respect to Child

In his third issue, Husband contends that the trial court abused its discretion by granting him limited supervised visitation rights with respect to Child and conditioning these visitation rights on Husband's completion of a psychological evaluation. We disagree.

### 1. Applicable Law and Standard of Review

We review a trial court's decisions on custody, control, possession, and visitation matters for an abuse of discretion. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *see also In re W.M.*, 172 S.W.3d 718, 724 (Tex. App.—Fort Worth 2005, no pet.) (reasoning that the trial court has "wide latitude in determining the best interests of a minor child"). To determine whether a trial court abused its discretion, we must decide whether the court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004); *W.M.*, 172 S.W.3d at 725.

An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see Low*, 221

23

S.W.3d at 620. We must be cognizant that the trial court is in a better position to decide custody cases because "it faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent." *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied).

The best interest of the child is always the primary consideration in determining issues of conservatorship and possession. Tex. Fam. Code Ann. § 153.002. While there is a statutory presumption that the parents be appointed joint managing conservators, there is no statutory presumption that joint managing conservators be awarded equal periods of possession. *Compare id.* § 153.131(b) (presumption that appointment of parents as joint managing conservators is in best interest of child), *with id.* § 153.135 (providing that joint managing conservatorship does not require the award of equal or nearly equal periods of physical possession of and access to the child). "A trial court does not abuse its discretion in restricting a parent's possession when the record contains some evidence to support a finding that such restrictions are in the child's best interest." *Nikolenko v. Nikolenko*, No. 01-20-00284-CV, 2022 WL 479988, at *16 (Tex. App.—Houston [1st Dist.] Feb. 17, 2022, pet. denied) (mem. op.) (citing *In re P.A.C.*, 498 S.W.3d 210, 219 (Tex. App.—Houston [14th Dist.] 2016, pet. denied)), *cert. denied*, 2024 WL 1143680 (U.S. Mar. 18, 2024) (No. 23-746); *see Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002); *W.M.*, 172 S.W.3d at 725.

24

## 2. Analysis

Here, the trial court named Husband and Wife as Child's joint managing conservators, but it found that restricting Husband's access to and possession of Child was in the child's best interest. Thus, the trial court ordered Husband to complete (1) a psychological evaluation, (2) a court-approved parenting course, and (3) reunification therapy through a counselor chosen by Wife. The decree provides that after fulfilling these three requirements, Husband will be allowed to have supervised possession of Child for three hours on the first, third, and fifth Sundays of every month.

The following evidence in the record supports the trial court's determination that these restrictions are in Child's best interest:

- Upon receiving a text from Wife informing him that she had filed for divorce, Husband showed up fifteen minutes later banging on her front door. During their ensuing conversation, which Wife recorded, Husband became agitated and began hitting himself in the head with a closed fist hard enough to make a noise. This caused Wife to fear that Husband might try to hurt her—or even kill her—and she asked him to stop. During the heated conversation, Husband could not control his cursing in front of Child, who was two years old at the time. At one point during this episode, Husband told Wife, "You're lucky I'm not doing worse," which Wife understood to be a threat.

- The next month, Husband refused to return Child following a visit, accusing Wife of "irrational behavior," "hav[ing] nefarious intentions," and being a "flight risk." Husband only returned Child after Wife called the police.

- Shortly thereafter, Wife contacted Child Protective Services because she was concerned that Husband had not been properly supervising Child, and Wife testified that CPS made a finding of neglectful supervision against Husband.

- After a temporary-orders hearing in March 2016, the trial court ordered Husband to undergo a psychological evaluation and to take

25

anger-management classes. But Husband never underwent a psychological evaluation, and while he took an online anger-management class, it does not appear that he took it seriously. He live streamed his attendance of the anger-management course, and during the live stream he stated that "we're going to enjoy the bulls**t that is the hypocrisy of the family court system" and expressed his intent to disobey the orders of the court. *See, e.g., Mauldin v. Clements*, 428 S.W.3d 247, 270 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (noting that the fact that mother had "repeatedly demonstrated an unwillingness to cooperate with the trial court's orders" by, among other things, failing to "seek[] individual therapy" was a factor supporting the trial court's determination that limiting her visitation with her children to supervised visitation was in the children's best interest).

- Wife testified that it was "very, very common" for Husband to yell at her and threaten her; that he often slept with a gun under his pillow; and that although Husband was never physically violent directly towards her, he was frequently violent towards objects in her vicinity.[14] *Cf. In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (noting that "[a] parent's abusive or violent conduct can produce a home environment that endangers a child's well-being" and that "want of self control[] and propensity for violence may be considered as evidence of endangerment").

Given this record, we conclude that there is some evidence to support a finding that restrictions on Husband's possession, including supervised visitation conditioned on the completion of a psychological evaluation, are in Child's best interest. Therefore, the trial court did not abuse its discretion.[15] *See Nikolenko*, 2022 WL

---

[14]As an example, Wife described an incident in which Husband had kicked apart a bookshelf in their garage, damaging it to the point that it was no longer functional and had to be thrown away. She also stated that "[h]e would take a baseball bat to the trees out in the front yard."

[15]Husband argues that because the trial court did not find that he had committed family violence and because there are certain cases in which parents who had committed family violence were given less onerous restrictions than those imposed on Husband here, the trial court abused its discretion. However, as noted

26

479988, at *16; *P.A.C.*, 498 S.W.3d at 219–20; *see also Iliff v. Iliff*, 339 S.W.3d 126, 141 (Tex. App.—Austin 2009) (mem. op.) (concluding that trial court did not abuse its discretion by restricting father's visitation until after he completed a "court-ordered neuropsychological evaluation"), *aff'd*, 339 S.W.3d 74 (Tex. 2011).

We overrule Husband's third issue.

## D. Appellate Bond

In his fourth issue, Husband argues that the trial court abused its discretion by ordering Husband to post a $25,000 bond if he appealed the divorce decree to this court and to post an additional $10,000 bond if he appealed to the Texas Supreme Court. We agree.

Generally, appellants in civil cases are not required to post a bond to perfect an appeal. *See In re Marriage of Richards*, 991 S.W.2d 30, 31 (Tex. App.—Amarillo 1998, op. on motion) (per curiam) (explaining that after extensive changes to the Texas Rules of Appellate Procedure that went into effect on September 1, 1997, appellants in civil cases are no longer required to post a "cost bond" to cover the costs incurred by the appellee if the appeal is unsuccessful), *disp. on merits*, 991 S.W.2d 32 (Tex. App.—

---

above, the best interest of the child is always the primary consideration in determining issues of conservatorship and possession, Tex. Fam. Code Ann. § 153.002, and a trial court's best-interest determination is necessarily fact-specific, *see, e.g.*, *Dunn v. Garcia*, No. 01-21-00100-CV, 2022 WL 2347739, at *7 (Tex. App.—Houston [1st Dist.] June 30, 2022, no pet.) (mem. op.). Because each family situation is unique, the mere fact that other courts may have imposed lesser restrictions in certain cases—even those involving family violence—does not lead us to conclude that the trial court abused its discretion by imposing the above-described restrictions on Husband's access to Child.

Amarillo 1999, pet dism'd). Further, although a trial court may award appellate attorney's fees to a prevailing party in certain circumstances, these fees must be conditioned upon the recipient's success on appeal. *See Sundance Mins., L.P. v. Moore*, 354 S.W.3d 507, 515 (Tex. App.—Fort Worth 2011, pet. denied); *Keith v. Keith*, 221 S.W.3d 156, 171 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *Hous. Livestock Show & Rodeo, Inc. v. Hamrick*, 125 S.W.3d 555, 586 (Tex. App.—Austin 2003, no pet.). And "a court is prohibited from requiring a party to post bond for conditional appellate fees." *In re K.K.W.*, No. 05-16-00795-CV, 2018 WL 1477533, at *4 (Tex. App.—Dallas Mar. 27, 2018, no pet.) (mem. op.) (citing *Hughes v. Habitat Apartments*, 828 S.W.2d 794, 795 (Tex. App.—Dallas 1992, no writ) (per curiam)).

Further, although the Texas Civil Practice and Remedies Code authorizes a trial court to order a party to furnish a bond or other security before further pursuing litigation if the trial court determines that the party is a "vexatious litigant," *see* Tex. Civ. Prac. & Rem. Code Ann. § 11.055(a), the statute establishes specific procedures that must be followed before the trial court can make such a determination, *see id.* §§ 11.051–.057. The statute contemplates that a vexatious-litigant determination will only be made after a motion is filed and the court, after giving notice to all parties, conducts a hearing thereon. *See id.* §§ 11.051, .053(a).

During trial, Wife asked the trial court to declare Husband a vexatious litigant and to require him to post a bond if he appealed to this court and another bond if he appealed to the Texas Supreme Court. But it does not appear that Wife ever filed a

motion seeking this relief. *See id.* § 11.051. Nor does it appear from the record that Husband was given notice before trial of Wife's request to have him declared a vexatious litigant. *See id.* § 11.053(a). Further, Wife offered no evidence showing (1) that Husband satisfied the statutory criteria necessary for a vexatious-litigant finding,[16] *see id.* § 11.054, or (2) that the amounts of the bonds—$25,000 and $10,000—bore any relation to the reasonable expenses, including costs and attorney's fees, that Wife would incur as a result of an appeal,[17] *see id.* § 11.055(c); *Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 355 (Tex. 2020) (admonishing that even though appellate attorney's fees are uncertain, this "does not excuse a party seeking to recover contingent appellate fees from the need to provide opinion testimony about the

---

[16]In her brief, Wife notes that Husband appears on the Office of Court Administration's list of vexatious litigants based on prior litigation that he filed against his first ex-wife in Cooke County. *See* Office of Court Administration, *Vexatious Litigants*, https://www.txcourts.gov/judicial-data/vexatious-litigants/ (last visited Apr. 26, 2024). But it does not appear that Wife offered evidence of this prior vexatious-litigant finding at trial, nor did she offer any evidence to establish that Husband's prior litigation against his first ex-wife was "based on the same or substantially similar facts, transition [sic], or occurrence" as the present case. Tex. Civ. Prac. & Rem. Code Ann. § 11.054(3). Thus, the trial court could not properly have relied on the prior vexatious-litigant finding against Husband to grant Wife's vexatious-litigant motion in this case. *See id.*; *Douglas v. Am. Title Co.*, 196 S.W.3d 876, 882 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

[17]Indeed, because Wife is represented by Legal Aid of NorthWest Texas, she likely will not incur any appellate attorney's fees. *See* Legal Aid of NorthWest Texas, www.legalaidtx.org (last visited Apr. 26, 2024) ("Legal Aid of NorthWest Texas works to ensure equal access to justice by providing free civil legal services to low-income individuals and families in the 114 counties we serve across North and West Texas.").

services it reasonably believes will be necessary to defend the appeal and a reasonable hourly rate for those services").

Because the only basis on which Wife asked the trial court to require Husband to post an appellate bond is the vexatious-litigant statute and because Wife failed to comply with the procedural requirements of that statute or to offer any evidence satisfying the statutory criteria for a vexatious-litigant finding, the trial court erred by ordering Husband to post an appellate bond.

Accordingly, we sustain Husband's fourth issue.

**E. Information Concerning the Child-Support Trust**

In his fifth issue, Husband contends that the trial court abused its discretion by ordering him to produce documents relating to the Child-Support Trust. We disagree.

Husband argues that he should not be required to provide information about the Child-Support Trust because the trial court found that the prenuptial agreement providing for the trust's payment of child support did not exist and that any memoranda of understanding between the parties were "null and void." Husband asserts that the trial court's findings make the Child-Support Trust irrelevant to the divorce proceeding and that he should not be required "to give [Wife] information about a trust that does not 'exist.'"

But Husband's argument conflates the trust's existence with that of the prenuptial agreement and the memoranda of understanding; the trial court never found that the trust did not exist. Indeed, Husband acknowledged that the trust exists

and testified that he created it approximately six months before he married Wife "to take care of any future marriage, children, so on and so forth."

Wife testified that she wanted information regarding the Child-Support Trust so that she could determine whether Child might be able to receive distributions from it in the future to help cover the costs of his college education. Given Wife's reasonable belief that Child may be entitled to receive distributions from the trust to cover educational expenses and Husband's acknowledgement that he had established the trust to take care of his children, we cannot conclude that the trial court abused its discretion by ordering Husband to provide information pertaining to the trust. *Cf. Rubinett v. Rubinett*, No. 02-08-00021-CV, 2009 WL 1372936, at *4 (Tex. App.—Fort Worth May 14, 2009, pet. denied) (mem. op.) (overruling husband's complaint that the trial court had abused its discretion by ordering him to provide documentation to wife concerning a college fund that he had set up with his separate property for the benefit of their son).

We overrule Husband's fifth issue.

### III. CONCLUSION

Having sustained, in part, Husband's first issue, we reform and affirm the trial court's child-support award and the amount of the bond securing this award conditioned upon Wife's filing a remittitur as suggested above. *See* Tex. R. App. P. 46.3. But if Wife does not file the suggested remittitur within fifteen days, we will reverse the child-support award and remand for a new trial regarding Husband's

child-support obligation and the amount of the bond securing that obligation. *See id.* Further, having sustained Husband's fourth issue, we modify the divorce decree to delete the requirement that Husband post appellate bonds in the event of appeals to this court and the Texas Supreme Court. *See* Tex. R. App. P. 43.2(b). Having overruled Husband's remaining issues, we affirm the decree in all other respects. *See* Tex. R. App. P. 43.2(a).

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: May 2, 2024